**GORDON W. STEWART**, OSB 74315
gordy@gstewartlaw.com
**STEWART LAW OFFICES**
1195 NW Wall Street
Bend, Oregon 97701
Telephone: (808) 243-9000
Facsimile: (877) 395-1552

**BRUCE A. KASER (*pro hac vice* pending)**
bruce@vantagelaw.net
**VANTAGE LAW PLLC**
420 Front Street
Issaquah, Washington 98027
Telephone: (425) 391-8741
Facsimile (425) 391-8754

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| KEITH MANUFACTURING, CO., <br><br> PLAINTIFF, <br><br> v. <br><br> LARRY D. BUTTERFIELD, <br><br> Defendant. | CIVIL ACTION NO.: <br><br> **COMPLAINT FOR DECLARATORY RELIEF (PATENT INFRINGEMENT – U.S. PAT. NO. 9,126,520); BREACH OF EMPLOYMENT CONTRACT; AND VIOLATION OF TRADE SECRETS** <br><br> Jury Trial Demanded |

Plaintiff Keith Manufacturing Co. ("Keith" or "Plaintiff") alleges as follows:

### I.    PARTIES, JURISDICTION, AND VENUE

1.    Keith is a corporation organized and existing under the laws of the State of

Oregon, having a principal place of business at 401 NW Adler Street, Madras, Oregon 97741.

COMPLAINT - 1

2.      Defendant Larry D. Butterfield ("Butterfield" or "Defendant") is an individual doing business under the assumed name "LoadBacker," having a principal place of business at 1838 Osage Rd., Clay Center, Kansas 67432.

3.      Keith is in the business of manufacturing and distributing mechanisms known as "reciprocating floor conveyors."  Reciprocating floor conveyors are typically built into the floor of a truck trailer.  These conveyors have reciprocating floor slats that move the trailer's load horizontally out from the back end of the trailer.  The conveyors allow truck trailers to haul and unload bulk materials, without need for a tilt-bed lift.  Keith also makes and distributes related accessory products such as floor clean out systems ("moving headboards").  A moving headboard sweeps clean the reciprocating floor conveyor (built into the trailer floor) during the trailer unloading process.

4.      Butterfield is a former employee of Keith.

5.      In 2004, Butterfield executed a written employment contract with Keith in Madras, Jefferson County, Oregon.  Butterfield's employment contract called for full time employment at a salary of $70,000 per year, plus other compensation.  During the course of his employment, Butterfield received regular payroll checks from Keith's office in Madras.

6.      Butterfield agreed that his employment contract with Keith would be governed by Oregon law.

7.      Butterfield had frequent contacts with Keith in Madras, Oregon, during the course of Butterfield's employment with Keith, from commencement of his employment in January 2004 until he self-terminated in May 2009.

8.      During the course of his employment, Butterfield traveled on behalf of Keith, he attended trade shows in various states on behalf of Keith, and he followed up with Keith trailer

COMPLAINT - 2

manufacturing customers concerning installation of Keith products.  Keith's products are typically manufactured at Keith's facility in Madras, Oregon, and shipped from Oregon to a trailer manufacturer when a sale is made.  During the course of his employment with Keith, Butterfield arranged for numerous sales transactions of this kind.  Butterfield reported to Keith management in Oregon during the term of his employment.

9.    All of the causes of action set forth in this complaint arise from Butterfield's breach of his employment contract with Keith.

10.    This Court has jurisdiction over the subject matter of this action on the following grounds:

(a) 28 U.S.C. §§ 1331, this being a civil action arising under the laws of the United States;

(b) 28 U.S.C. §§ 1332, this being a civil action involving one or more matters in which diversity of citizenship exists and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs;

(c) 28 U.S.C. § 1338, this being a civil action arising under an Act of Congress relating to alleged patent rights; and

(d) 28 U.S.C. § 2201-2, because an actual and justiciable controversy exists concerning the patent rights of, and legal relations between, Keith and Butterfield.

11.    This Court has supplemental jurisdiction over Keith's state law claims under 28 U.S.C. § 1367(a).

12.    Personal jurisdiction over Butterfield is proper because Butterfield entered into a written employment contract with Keith in this jurisdiction; and Butterfield has had substantial contacts with this jurisdiction due to his nearly five (5) year employment relationship with Keith.

COMPLAINT - 3

Butterfield has also directed threats of patent infringement at Keith that have created a patent controversy in this jurisdiction concerning Keith's manufacturing and sales operations in Madras, Oregon.

13.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1400 because a substantial portion of the events or omissions giving rise to Keith's claims occurred in this district.

## II.    FACTS

14.     Keith incorporates by reference all of the factual allegations set forth above.

15.     Butterfield was employed by Keith as a salesperson.  He executed a written employment agreement with Keith ("the 2004 employment agreement") on January 19, 2014, at the time he was hired.

16.     Among other things, the 2004 employment agreement obliged Butterfield to be forthcoming with Keith about inventions, if Butterfield believed he had invented anything before or during his employment with Keith.  The 2004 agreement also protected Keith from claims by Butterfield concerning Keith's use of any design or business ideas attributable to Butterfield.

17.     Concerning earlier, pre-employment ideas that Butterfield may have had before Keith hired him, the 2004 employment agreement provided Keith with a royalty-free safe harbor from suit if Keith used, in Keith's business, any of Butterfield's pre-employment ideas.

18.     Concerning ideas Butterfield may have conceived of or developed during the time he worked for Keith, patentable or not, the 2004 employment agreement provided Keith with a royalty-free right to use such ideas.

COMPLAINT - 4

19.    With respect to inventions that could be patented, the 2004 employment agreement granted to Keith exclusive ownership of any patentable inventions that arose from Butterfield's ideas during the regular course of his employment.

20.    The 2004 employment agreement also placed requirements on Butterfield that prohibited Butterfield from misusing Keith's confidential information.

21.    As a Keith employee, Butterfield had access to and direct contact with Keith's customers.  Butterfield was also privy to Keith's ongoing design activities relating to new products.

22.    Prior to the development activities that gave rise to the current lawsuit, Keith marketed a flexible moving headboard system called the "CleenSweep" (which Keith continues to sell today) and other "sweep" products for Keith's reciprocating floor conveyors.  Butterfield sold many CleenSweep products during his years as a Keith employee and either sold or was familiar with the other "sweep" products.

23.    During the last few years of Butterfield's time as a Keith employee, Keith became involved in ongoing development activities that were intended to expand Keith's reciprocating floor designs into new markets that involved hauling asphalt and other heavy bulk materials, like rock.  The CleenSweep was not an effective moving headboard product for sweeping out trailers that hauled certain types of these heavier materials.

24.    As part of entering the asphalt hauling market, Keith became involved in designing an early prototype version of a hard-backed moving headboard system for Travis Trailer.  Travis Trailer had built a trailer (called the "TravisMule") that used a Keith-designed, heavy-duty reciprocating floor system for hauling asphalt.  The moving headboard prototype that Keith developed for the TravisMule was intended to sweep out asphalt.

COMPLAINT - 5

25.     Keith delivered the parts for the TravisMule headboard to Travis Trailer in 2007.

26.     During the 2007-2008 time frame, Keith independently made efforts to design a hard-backed moving headboard for a customer in the United Kingdom ("U.K.") who was similarly using a heavy-duty Keith reciprocating floor for hauling asphalt.  The U.K. project involved a different moving headboard design compared to the TravisMule headboard – the U.K version being a "stand-alone" moving headboard design that was developed in-house by Keith in Madras, Oregon.  Various Keith personnel and facilities were used to create the design.

27.     As a Keith salesperson, Butterfield was aware of and involved in Keith's design activities relating to both the TravisMule project and the United Kingdom customer.

28.     In April 2008, Keith created engineering drawings (later called "the V-Sweep drawings" by Keith) of the "stand-alone" version of the moving headboard.

29.     The V-Sweep drawings eventually gave rise to Keith's present-day moving headboard products sold as the BSH-58 "Bulk Sweep" headboard and another, related headboard product that Keith currently markets as the "V-Sweep."

30.     Jim Drago ("Drago"), a Keith engineer, created the April 2008 V-Sweep drawings as part of his involvement with the United Kingdom project.

31.     Butterfield did not create the V-Sweep drawings.

32.     On April 21, 2008, Drago emailed the April 2008 V-Sweep drawings to various Keith personnel who were involved in developing the asphalt hauling market for Keith, including Butterfield.

33.     The April 2008 V-Sweep drawings carried a proprietary notice that stated, in pertinent part, "The designs and ideas shown hereon are the property of KEITH MFG. CO. and shall not be used, disclosed to others, or copied, in whole or in part, without prior permission."

COMPLAINT - 6

34.     On June 30, 2008, Mark Allan from Keith emailed to Keith personnel a report on successful United Kingdom trials of the stand-alone headboard depicted in Drago's V-Sweep drawings.  About sixteen (16) photos were attached to the email showing the headboard in operation.  Butterfield was one of the recipients of the June 30 email report and the photos.

35.     Two months later, on August 1, 2008, Butterfield took it upon himself to file a patent application with the U.S. Patent and Trademark Office ("USPTO").

36.     Butterfield's patent application illustrated and described substantially the same thing as the headboard design illustrated in Drago's V-Sweep drawings.  Butterfield claimed to be both the "inventor" and the "owner" of the patent application.

37.     Without telling Keith, Butterfield commenced manufacturing and selling stand-alone headboards to Keith customers, on the side, under the trademark "LoadBacker."  Like Butterfield's patent application, the LoadBacker's design was substantially identical to the design illustrated in Drago's V-Sweep drawings

38.     On September 20, 2008, Butterfield separately filed an application in the USPTO to register the trademark "LoadBacker" for Butterfield's side business.  He later informed the USPTO that he was using the trademark on goods actually sold in the marketplace as early as October 1, 2008.

39.     During the months that followed, Keith management became aware that Butterfield was running a side business, in competition with Keith, while also working as a full-time Keith employee.  Keith management also learned that Butterfield had made his own patent filing on a Keith-developed design.

COMPLAINT - 7

40.    In May 2009, Keith was expressing dismay about the above events.  Among other things, Butterfield was told, "Are you on a sales call for KMC or for Butterfield Mfg and how do I or anyone else know for sure?"

41.    Butterfield responded by claiming that the design was his idea from years earlier.  Concerning his patent filing, among other things, Butterfield stated, "I became nervous KEITH Mfg. Co. would drag our feet & 'moving Headboard' idea would pass me by before patent could be applied for, thus becoming not eligible for patent rights?"

42.    Concerning competing with Keith while being employed by Keith at the same time, Butterfield stated, in part, "KMC did not offer a moving headboard.  I have told customers, since KMC doesn't have to offer, a small shop builds these as needed.  To the best of my knowledge, I have not had or do not know of any complaints, as they felt a problem they've been having in the field has been addressed."

43.    Butterfield also told Keith, "Lastly, I have not started any new business.  I have only used as existing company name of many years, of which I now regret due to creating part of this situation."  And Butterfield said, "For years, I have wanted to try & figure out a way that I could supplement my income by having some type of additional money coming in to do so."

44.    Butterfield self-terminated his employment with Keith, effective on May 29, 2009, and immediately went to work for Travis Trailer.

45.    Travis Trailer immediately objected to Butterfield continuing to run his LoadBacker business on the side.

46.    During the course of attempting to resolve Travis Trailer's objections, Butterfield provided a written proposal to Travis Trailer, dated June 6, 2009, for the purpose of encouraging Travis Trailer to carry Butterfield's LoadBacker business as a Travis Trailer product.

COMPLAINT - 8

47.    In the June 6 proposal to Travis Trailer, Butterfield admitted that the first implementation of Loadbacker occurred in August 2007, to overcome unsatisfactory unloading ("floor sweeping") results while unloading asphalt. Butterfield's proposal referred to a second moving headboard installation in December 2007 after LoadBacker had proven effective in the field. Following the second installation, Butterfield claimed, "I've had the opportunity to grow this project to a number of 19 units in operation as of to date."

48.    Butterfield's June 6 proposal was referring to Keith's TravisMule and United Kingdom design activities.

49.    Butterfield's disclosure to Travis Trailer that Butterfield had sold 19 headboard units on his own, while being paid as a full-time Keith employee, represents significant business that he took away from Keith.

50.    Butterfield directed sales to his LoadBacker business, and away from Keith, by misrepresenting to customers that Keith was not prepared to provide a stand-alone moving headboard product to Keith's customers, even though Butterfield knew Keith was prepared to provide such products to customers in the asphalt hauling market.

51.    Travis Trailer declined to become involved in Butterfield's LoadBacker project because Travis Trailer knew of Keith's involvement with the TravisMule and it was clear to Travis Trailer that Butterfield was describing Keith development activities while Butterfield was employed there.

52.    Butterfield is no longer an employee of Travis Trailer.

53.    Patent applications are handled by the USPTO on an *ex parte* basis with no procedural opportunities made available to the public to protest a pending patent application until such time as it is issued by the USPTO as a formal "patent."

54.    The USPTO rejected Butterfield's patenting efforts for years. Butterfield eventually misrepresented to the USPTO that the design disclosed in his patent application was novel because the headboard had a floor tarp component ("the leading edge tarp") that flexed over the tail-end of the trailer during the last part of the unloading process. Butterfield told the USPTO, "This is a fundamental feature of the present invention, and distinguishes the present invention as claimed from all known prior art." A USPTO patent examiner granted Butterfield the patent based on that misrepresentation.

55.    As a result of the misrepresentation about the leading edge tarp, and because the USPTO did not otherwise have information to the contrary, on September 8, 2015, the USPTO formally issued to Butterfield U.S. Patent No. 9,126,520 (or "the 520 patent").

56.    The leading edge tarp was used by Keith in the TravisMule project; The leading edge tarp was a feature of the V-Sweep drawings that were created by Drago at Keith and emailed to Butterfield almost four (4) months before Butterfield filed the patent application; the leading edge tarp was also present in the United Kingdom project that was designed by Keith and shown in numerous photographs provided to Butterfield before he filed the patent application; and the leading edge tarp was otherwise a common feature from clean out systems that had been in public use for years preceding the filing of Butterfield's patent application.

57.    Almost immediately following issuance of his patent, by letter dated October 9, 2015, Butterfield alleged that Keith is now producing a moving head board product that infringes the 520 patent and "is covered by at least claim 6 of the 520 Patent." Butterfield provided a "chart" for the purpose of demonstrating Butterfield's allegation of patent coverage. Butterfield demanded that Keith "immediately cease and desist" from further marketing of Keith's stand-alone headboard products within ten (10) business days of October 9.

COMPLAINT - 10

58.     Butterfield's allegations and demands create a clear threat and reasonable apprehension, on Keith's part, that Butterfield is about to sue Keith for infringement of the 520 patent.

### III.     CLAIMS FOR RELIEF

#### A.     FIRST CLAIM FOR RELIEF – NON INFRINGEMENT OF 520 PATENT

59.     Keith incorporates by reference all of the paragraphs set forth above.

60.     Because Butterfield is claiming that Keith's stand-alone moving headboards infringe the 520 patent, and Butterfield is demanding that Keith immediately cease marketing, sales, and advertising of these products, there is an actual, substantial, and justiciable controversy between Keith and Butterfield.

61.     Butterfield's threat of infringement has created a cloud over Keith's business activities that is likely to cause Keith to lose sales and business opportunities until such threat is resolved.

62.     Butterfield's threat of infringement is likely to cause uncertainty among customers, prospective customers, suppliers, and others in the marketplace.

63.     On information and belief, Keith's BulkSweep, V-Sweep and/or other moving headboard products do not infringe any valid claims of the 520 patent.

#### B.     SECOND CLAIM FOR RELIEF – PATENT INVALIDITY

64.     Keith incorporates by reference all of the paragraphs set forth above.

65.     Butterfield's broad assertion, construction, and/or interpretation of the 520 patent, including Butterfield's wrongful claim of inventorship, renders the claims thereof invalid in view of the prior art and/or for failure to comply with the provisions of one or more sections of the patent laws of the United States, 35 U.S.C. § 1 *et seq*.

COMPLAINT - 11

### C.    THIRD CLAIM FOR RELIEF – BREACH OF CONTRACT

66.    Keith incorporates by reference all of the paragraphs set forth above.

67.    The moving headboard design disclosed in the 520 patent was developed at Keith during the time Butterfield was a Keith sales employee.

68.    Butterfield breached his employment contract with Keith by claiming to own patent rights on a design that was developed using Keith's time, materials, and facilities.

69.    Butterfield breached his employment contract with Keith by unilaterally filing a patent application on a design that was developed using Keith's time, materials, and facilities.

70.    Butterfield breached his employment contract with Keith by threatening Keith with a patent infringement action on a patent that Keith either owns or has a royalty-free right to use pursuant to specifically stated terms of Butterfield's employment contract with Keith.

### D.    FOURTH CLAIM FOR RELIEF – TRADE SECRET

71.    Keith incorporates by reference all of the paragraphs set forth above.

72.    The success of Keith's business is dependent on ongoing product development and recognition of new market opportunities.

73.    The product development activities undertaken by Keith to enter the asphalt hauling market involved the creation of information that was not generally known to Keith's competitors at the time, and included: design ideas, proprietary drawings, solutions to engineering problems, information relating to testing of products, and information concerning potential customers who would be interested in switching to reciprocating floor systems designed to haul asphalt.

74.    Keith's product development ideas relating to entry into the asphalt hauling market had actual or potential economic value because they offered entry into a marketing niche

COMPLAINT - 12

where reciprocating floor conveyors had not been used before and, therefore, represented new business for Keith.  Keith's marketing personnel were in a unique position to understand the economic value of entry into an untapped market for reciprocating floor conveyors.  Keith's time, materials, facilities, and costs incurred in the problem-solving and design efforts that led to the development of a stand-alone, moving headboard had economic value.

75.    The economic value of entry into the asphalt hauling market was not known to the public or recognized in the industry at the time Keith was developing products (floor systems and headboards) for this market.  However, Keith personnel, which included Butterfield, were aware of the potential value of the asphalt hauling market.  Keith's problem-solving and design efforts in creating a stand-alone, moving headboard that worked for asphalt-hauling was not known to the public at the time Keith was undertaking these activities.

76.    Keith undertook reasonable efforts to maintain confidentiality or secrecy.  For example, Butterfield was required to execute an employment agreement that obliged him to maintain the confidentiality of Keith's marketing and product development efforts.

77.    Because of his employment relationship with Keith, Butterfield had access to and acquired Keith's confidential design ideas, proprietary drawings, solutions to engineering problems, information relating to testing of products, and information concerning marketing to potential customers who would be interested in switching to reciprocating floor systems designed to haul asphalt.

78.    While Butterfield was a Keith employee, and without Keith's consent, Butterfield misused the above information to create his own independently-operated business, on the side, that targeted Keith customers who were interested in purchasing or using reciprocating floor conveyors to haul asphalt and other bulk materials.

COMPLAINT - 13

79.     Butterfield should have known or had reason to know he was misusing Keith's confidential information when, among other things, he incorporated Drago's V-Sweep drawings into a patent filing, because the drawings were marked as being proprietary to Keith.

80.     Because he was a fulltime Keith employee and had executed an employment agreement, Butterfield owed Keith a duty to limit use of Keith's confidential information to Keith's business activities and not use such information for Butterfield's independent business that both competed with Keith and diverted business away from Keith.

81.     Butterfield activities are in violation of ORS 646.461 *et. seq.*

## PRAYER FOR RELIEF

Keith respectfully requests the following relief from the Court:

1.      A declaration of Judgment in Keith's favor that Keith is not infringing the 520 patent or that the 520 patent is otherwise invalid.

2.      Damages for Butterfield's breach of contract, including an order that Keith either owns or is licensed to use any valid rights relating to the 520 patent.

3.      Damages for violation of ORS 646.461 *et seq.*

4.      An injunction against Butterfield prohibiting Butterfield from making further use of Keith's trade secrets.

5.      An award of attorney's fees and costs pursuant to the terms of the 2004 employment agreement.

6.      Costs, disbursements and attorney's fees incurred herein including remedies the Court may order pursuant to ORS 646.461 *et. seq.*

7.      Punitive damages as a result of Butterfield's wrongful conduct.

8.      Such other relief as the Court deems just and appropriate

COMPLAINT - 14

DATED this 23rd day of October, 2015.

**STEWART LAW OFFICES**

By  /s/ Gordon W. Stewart
    **Gordon W. Stewart**, OSB 74315
    Telephone: (808) 243-9000
    Facsimile: (877) 395-1522
    gordy@gstewartlaw.com

    Of Attorneys for Plaintiff